IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: **1:24-cv-24826**-CV-_____

JESUS IGNACIO PEREZ MENDEZ,

    Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC,

    Defendant.

**JURY TRIAL DEMANDED**

## COMPLAINT

Jesus Ignacio Perez Mendez ("Plaintiff" or "Mr. Mendez"), by and through the undersigned counsel, brings this action against Equifax Information Services, LLC ("Defendant" or "Equifax") and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of Defendant's blatantly inaccurate credit reporting, wherein the Defendant reported to Plaintiff's potential creditors that Plaintiff had no credit history or credit score.

12. Accordingly, Plaintiff brings claims against the Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14. Jesus Ignacio Perez Mendez ("Plaintiff" or "Mr. Mendez") is a natural person residing in Hialeah, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District. Equifax can be served at its registered agent Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

16. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Factual Background**

24. The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

25. Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

26. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28. Defendant's consumer reports generally contain the following information:

(a) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29. Defendant obtains consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

30. The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions.

31. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in Defendant's consumer reports.

32. The information Defendant includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

33. FICO Scores are calculated using information contained in Defendant's consumer reports.

34. Defendant knows that FICO and other third-party algorithms (as well as the algorithms owned by CRAs) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

35. Defendant knows that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

36. DTI compares the total amount a consumer owes to the total amount a consumer earns.

37. The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

38. Defendant routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

39. Defendant fails to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

40. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against Defendant for its inaccurate credit reporting.

41. Thus, Defendant is on continued notice of its inadequate reporting procedures. Specifically, Defendant is on notice that its inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

42. Defendant has received and documented many disputes from consumers complaining that Defendant reported inaccurate information about them.

### Plaintiff Moves to the United States

43. In or around April 2022, Plaintiff arrived in the United States from Cuba in search of a better life. Plaintiff eventually received his social security number ("SSN") in August 2023.

44. Since coming to the United State Plaintiff has opened various credit and banking accounts including, but not limited to, the following (collectively, "Tradelines"):

   (i)   Two Capital One, N.A Credit Cards;

   (ii)  Austin Capital Bank;

   (iii) Apple Credit Card serviced by Goldman Sachs;

   (iv)  American Express Credit Card;

   (v)   Unicorn Credit Card with WSFS Bank; and

   (vi)  Two Discover Bank Credit Cards

**Plaintiff Reviews his Credit Reports and Notices Equifax Deleted his Entire Credit History**

45. In or around October 2024, Plaintiff reviewed his annual credit reports with Defendant, as well as non-party Trans Union LLC and non-party Experian Information Solutions Inc.

46. Plaintiff's Trans Union credit report and Experian credit report contained his accurate credit history, including Plaintiff's Tradelines.

47. However, Plaintiff was shocked, confused, and worried after reviewing his Equifax credit report.

48. Although Plaintiff's Equifax credit report dated October 4, 2024, had his correct name, SSN, and address, there was no mention of any account information (no mention of Plaintiff's Tradelines), no hard inquiries, and Plaintiff's year of birth was incorrect (1994 instead of 1993).

49. Furthermore, Plaintiff's Equifax credit report dated October 4, 2024, demonstrated that Plaintiff had a credit score of 0.

50. Plaintiff was bewildered because he knew he had open, active accounts and knew that he has good credit.

51. Plaintiff decided to check his Equifax credit reports on Credit Karma as well, and downloaded an Equifax credit report dated March 28, 2024, and an Equifax credit report dated August 4, 2024.

52. Plaintiff's March 2024 Equifax report listed Plaintiff's Tradelines and reported a credit score of 721, while Plaintiff's August 2024 Equifax report listed Plaintiff's Tradelines and reported a credit score of 747. However, according to Credit Karma, on August 4, 2024, all accounts were removed from Plaintiff's Equifax credit history, and his score dropped from *747 to 0*.

**Plaintiff's October 2024 Dispute to Defendant Regarding the Inaccurate Credit History**

53. On or about October 14, 2024, frustrated, worried, and embarrassed at the Defendant's inaccurate reporting, Plaintiff disputed Defendant's inaccurate reporting that Plaintiff

has no credit accounts, has a credit score of zero as well as his inaccurate birth year ("October 2024 Dispute"). Plaintiff disputed with Defendant via certified mail.

54. Along with Plaintiff's dispute letter, Plaintiff attached the following supporting documents (collectively, "Supporting Documentation"): (i) a copy of his driver's license, (ii) a copy of his social security card, (iii) credit reports from Trans Union and Experian showing his credit history, including, but not limited to, Plaintiff's Tradelines, and (iv) a dispute response from Equifax dated October 3, 2024, addressing a prior dispute submitted by Plaintiff to correct his year of birth.

55. Plaintiff requested that Defendant reinvestigate the disputed information and correct the reporting.

56. Furthermore, Plaintiff, trying to address Equifax's failure to reinvestigate the prior dispute Plaintiff sent Equifax to correct the inaccurate reporting of his birth year, also requested that the following 100-word statement be included in his credit file and in any credit report published to a third party:

> I was born in 1993, not 1994, as Equifax is inaccurately reporting. Despite informing Equifax of my correct birth year, they have not corrected it. Instead of correcting my birth year, Equifax has willfully deleted all my credit history and scored my credit at 0. Because Equifax's reporting is false, please obtain a credit report about me from TransUnion or Experian, which are providing accurate information as of October 10, 2024.

57. Upon information and belief, Equifax received Plaintiff's October 2024 Dispute Letter on or about November 20, 2024.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

58. On or about November 22, 2024, despite Plaintiff providing the Supporting Documentation, Defendant replied to Plaintiff's October 2024 Dispute stating that it was "unable to locate a credit file in their database with the identification he provided."

59. Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

60. Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's October 2024 Dispute.

61. Thereafter, Defendant Equifax failed to correct the credit score of zero and the fact that none of Plaintiff's accounts were appearing in Plaintiff's credit file.

62. Equifax failed to conduct a reasonable reinvestigation of Plaintiff's October 2024 Dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Applies for a Loan with PenFed Credit Union ("PenFed")**

63. In the beginning of 2024, Plaintiff suffered the tragic loss of his beloved Grandfather. Plaintiff traveled to Cuba at the end of January to spend time with his family and process the loss. Later on that year, dealing with the stress of losing her husband, Plaintiff's Grandmother became ill and was hospitalized. Unfortunately, Plaintiff was not able to travel back to Cuba because of his financial situation.

64. Plaintiff, already suffering from the loss of his Grandfather, wanted to visit his Grandmother in Cuba to help take care of her. However, Plaintiff did not have enough money or credit at the time to pay for the flight and trip. Plaintiff's family in Cuba also rely on Plaintiff for financial support.

65. Around the same time, Plaintiff started experiencing issues with his car, which he uses in his job as an Amazon Flex driver. Plaintiff began using his credit cards to repair his car little by little.

66. Thereafter, Plaintiff was finally able to travel to Cuba again after a severe situation in October, when his family endured 72 hours without electricity. During that trip, Plaintiff provided his family with food and essential medications.

67. As a result of the foregoing events, Plaintiff's credit utilization increased significantly and Plaintiff was in need of more credit.

68. Therefore, Plaintiff completed and submitted a credit application with PenFed.

69. For PenFed to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files. Plaintiff provided PenFed with his personal identification information, including his Social Security number, and authorized it to obtain his credit files.

70. Upon information and belief, Defendant sold a consumer report about Plaintiff to PenFed in relation to Plaintiff's credit application.

71. Upon information and belief, Defendant, in the consumer report it sold to PenFed concerning Plaintiff, indicated that it was unable to locate Plaintiff's credit file, or, in the alternative, indicated that Plaintiff had no credit accounts and had a credit score of 0.

**PenFed Denies Plaintiff's Credit Application**

72. Shortly after submitting his credit application, PenFed informed Plaintiff that his credit application could not be approved.

73. Thereafter, Plaintiff received an adverse action notice from PenFed which stated that Plaintiff's credit application was denied because Defendant was reporting that it could not locate Plaintiff's credit file or that Plaintiff had no credit history.

## PLAINTIFF'S DAMAGES

74. Plaintiff reasonably believes that the Defendant continued and continues to publish that Plaintiff did not have any credit score or credit file/history.

75. As a result of Defendant's reporting that Plaintiff did not have a credit score or credit file/history, and despite Plaintiff's efforts to dispute the same, the Defendant made it practically impossible for Plaintiff to continue to obtain credit.

76. As a result of Defendant's inaccurate reporting, Plaintiff was unable to obtain the credit he needs to support his family in Cuba. Plaintiff was unable to travel to Cuba again in December 2024 to resupply his family with essential foods and medications.

77. At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

78. At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

79. Defendant is aware of the shortcomings of its procedures and intentionally choose not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

80. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate

credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Equifax)

81. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

82. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

83. On at least one occasion, Defendant prepared a patently false consumer report concerning Plaintiff.

84. Defendant readily sold such false report(s) to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

85. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

86. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate

credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

87. Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

88. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant Equifax)

89. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

90. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

91. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

92. On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Defendant and requested that they correct and/or delete a specific item in his

credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the representation that Plaintiff didn't have a credit score or credit file reported by Defendant.

93. In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

94. The Credit Bureau Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

95. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

96. Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

97. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 10th day of December 2024

*/s/ David Pinkhasov*
David Pinkhasov, FL # 1040933
CONSUMER ATTORNEYS
72-47 139th Street
Flushing, NY 11367
T: (718) 701-4605
F: (718) 715-1750
E: dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff,*
*Jesus Ignacio Perez Mendez*